UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOHN FELDHAUS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:09CV01746 AGF |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff John Feldhaus was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on November 29, 1953, filed an application for disability benefits on June 4, 2007, at the age of 53, alleging a disability onset date of October 15, 2005, due to high blood pressure, anxiety, tremors, neck and back pain, and arthritis. After Plaintiff's application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on November 9, 2008. By decision dated May 29, 2009, the ALJ found that Plaintiff had engaged in substantial gainful employment from November 2006 to April 2007, and that thereafter his mental impairments were not severe and that he had the residual

functional capacity ("RFC") to perform the full range of medium work, and could thus perform his past relevant work as a route sales driver. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on September 17, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record. Specifically, Plaintiff argues that no medical evidence supports the ALJ's finding that Plaintiff could perform medium work, that he failed to ensure that the record was fully and fairly developed in this regard, and erred in relying on the absence of physician-ordered limitations when no doctor was asked to express such an opinion. Plaintiff further argues that the ALJ's assessment of Plaintiff's mental RFC failed properly to consider Plaintiff's global assessment of functioning ("GAF") scores. Lastly, Plaintiff argues that the ALJ erred in failing to go through a function-by-function analysis of Plaintiff's past work, as required. Plaintiff asks that the ALJ's decision be reversed and that the case be remanded for proper consideration of Plaintiff's RFC.

## BACKGROUND

### Work History and Application Forms

Plaintiff's application form states that he worked full time from April 1979 to October 2005 as a driver delivering beer, and full time from November 2006 to April 2007 as a highway maintenance worker. He described his driving work as requiring him to reach for and handle big objects, eight hours per day, and to handle small objects for

2

one hour per day; walk, stand, and sit each for four hours each day; crouch for a total of one and one half hours, and climb, stoop, kneel, and crawl one hour each day; and to frequently lift and carry 100 pounds or more. (Tr. 146-49.)

On July 7, 2007, Plaintiff completed a Function Report in conjunction with his application for disability benefits. He indicated that his daily activities included reading the paper, checking email, vacuuming, dusting, doing laundry, and taking out the trash. He left his home on a daily basis to run errands and engaged in social activities on a daily basis including having lunch with friends, spending time with family, and attending church. Plaintiff reported that his impairments did not affect his memory, concentration, understanding, or his ability to get along with others, complete tasks, or follow instructions. He also noted that he went fishing three times a year, and golfed occasionally. Plaintiff noted that he had difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs, all due to pain in his neck, back, and knees, and had difficulty using his hands due to tremors. He also indicated that things "out of the ordinary" tended to make him nervous. (Tr. 166-73.)

In his application for benefits, Plaintiff listed the medications he was taking as Citalopram Hydrobromide (Celexa) for anxiety/depression; two medications for high blood pressure, one medication for tremors, and Naproxen and Ibuprofen, as needed, for pain. (Tr. 184.)

**Medical Record**

It is not disputed that Plaintiff engaged in substantial gainful activity from

3

November 2006 to April 2007, and Plaintiff does not now argue that he was disabled from October 15, 2005, to November 2006; accordingly, the Court will focus its attention on the medical record after April 2007, considering records before that date as relevant background material. The record shows that Plaintiff saw James W. Ginther, M.D., a general practitioner, for anxiety since at least 2003, for which Plaintiff was taking Lorazepam. When Plaintiff visited Dr. Ginther on January 26, 2004, for hypertension and anxiety, Dr. Ginther indicated that Plaintiff was smoking two packs of cigarettes and drinking an average of six beers per day. (Tr. 231-33; 259-60.)

Plaintiff saw Dr. Ginther about three times a year in 2005 and 2006. In February and March 2006, Dr. Ginther diagnosed hypertension, depression, ethanol abuse, and essential tremor. (Tr. 204-09.) In November 2006, Plaintiff saw Premlata Nayak, M.D., through the Veterans Administration, as a new patient, and tested negative for both post traumatic stress disorder and depression. (Tr. 275-79.) On June 21, 2007, Dr. Nayak noted that Plaintiff was not currently on anxiety treatment. (Tr. 272-74.)

On July 25, 2007, non-examining state consultant Kyle Devore, Ph.D., completed a Psychiatric Review Technique form, assessing Plaintiff's mental condition from October 15, 2005. Dr. Devore indicated that Plaintiff's anxiety-related disorder was not severe, as Plaintiff had no restrictions of activities of daily living, no difficulty in maintaining social function, no difficulty maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. (Tr. 284-94.)

An x-ray of the cervical spine taken on August 10, 2007, showed severe

4

degenerative disc disease at C4-5 and C6-7. (Tr. 306-07.) Also on August 10, 2007, Plaintiff began treatment at a VA medical center for anxiety, upon referral by Dr. Nayak. Plaintiff complained of increasing anxiety over the past year; he did not think the Lorazepam he had been taking for about seven years was working. He described his alcoholic drinking as episodic, but excessive when he did drink, and claimed that drinking made him feel more relaxed. It was noted that Plaintiff had been in alcohol rehab twice in the past, the most recent time being seven years ago, and that his longest period of sobriety was one year. Plaintiff's appearance, eye contact, motor activity, speech, thought process, concentration, and memory were all "normal" or "good." His insight and judgment were "fair." He was diagnosed with anxiety disorder not otherwise specified ("NOS"), alcohol abuse, nicotine dependence, and a GAF score of 60.[1] Lorazepam was discontinued and Plaintiff was started on Hydroxyzine (Vistaril, Atarax) for his anxiety. (Tr. 340-42).

An MRI dated September 21, 2007, showed multilevel degenerative disc disease, likely fusion of C5 and C6, reversed curvature of the cervical spine, and narrowing of the

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

spinal canal and neural foraminal. (Tr. 302-04.)

At a psychiatric medication evaluation follow-up on the morning of October 1, 2007, Plaintiff had already consumed three beers. His GAF was assessed as 60. (Tr. 333-35.) Plaintiff underwent a substance abuse intake interview on October 25, 2007. He complained of little energy or motivation when he was not drinking, and reported a long history of panic attacks. The interviewing psychologist opined that Plaintiff did not yet seem committed to treatment. (Tr. 330).

Similar GAF scores and mental status evaluations, as well as advice to enter an alcohol treatment program, continued through January 2008. At an August 13, 2008 appointment, Plaintiff indicated that he was drinking less. His mood and affect were normal, and he was alert and fully oriented with good concentration. (Tr. 417). The results of a treadmill stress test on August 26, 2008, were normal. (Tr. 403-07.)

Plaintiff underwent a psychiatric evaluation with a new psychiatrist in January 2009. Plaintiff said that his moods were "good overall" and that he had "good enjoyment," although he reported a "little apathy" and some stresses with finances and the tremor affecting his head and neck. He had no recent panic attacks, but he reported anxiety when dealing with unfamiliar situations. Plaintiff indicated that he drank six beers or less over a four hour period usually once a week. His mental status examination revealed a "pretty good" mood, euthymic affect, and logical and goal oriented thought process. Erica C. Montgomery, M.D., diagnosed panic disorder, mild with agoraphobia; anxiety disorder NOS; depressive disorder NOS versus major depressive disorder now in

6

full remission; ethanol abuse, instead of ethanol dependence now in partial remission; and a GAF score of 55. It was also noted that Plaintiff was still using tobacco and was unwilling to try to stop. (Tr. 463-68).

A neurological exam and MRI of the lumbar spine were conducted in January 2009 due to Plaintiff's complaints of head and hand tremors and low back pain of one month's duration, which had worsened "since he was bicycling and walking." Plaintiff assessed his pain as a 2 or 3 (on a pain scale of 1 to 10). Plaintiff reported that his hand tremors were "not too bad," but that he felt his head tremors had worsened in the past few months. The clinical exam showed no pain in Plaintiff's joints or muscles, "5/5" upper and lower extremities motor testing, normal gait, and negative straight leg raise testing. Mentally, Plaintiff was alert and oriented with normal attention and concentration and normal recent memory recall. The MRI showed "moderate diffuse posterior bulge at L2-L3." Conservative management was recommended. (Tr. 468-74.)

**Evidentiary Hearing of April 1, 2009 (Tr. 498-509)**

Plaintiff, who was represented by counsel, testified that he was 55 years old, divorced, and living alone in an apartment. He testified that as a beer truck driver for 30 years, he drove a set route delivering half-barrels, and that he did all the hauling in and out of the truck himself. He was permanently replaced after a labor dispute in May 2005. He testified that from 2006 until April 2007, he worked "[p]art-time seasonally" as a highway maintenance worker.

Plaintiff stated that he was 5'11" tall, and weighed about 250 pounds. When asked

7

what medical conditions prevented him from working, he responded that he had lumbar disk problems, dating back approximately four years.  He also experienced essential tremor, which was diagnosed approximately five or six years ago.  In addition, he suffered from anxiety and depression, arthritis of the knees, hips, and hands, and some shortness of breath.  Plaintiff testified that he drank two to three beers per week after being told by his doctors to cut down on his drinking.  He was able to go on his annual fishing trip in April 2008, but only fished from the dock.

He testified that as a highway maintenance worker, his tasks included patching asphalt potholes and cleaning trash from the highway.  He stated that younger workers would help him and that he "just couldn't . . . do the work," but that the reason he left this job was because it was a seasonal job.  He was going to be transferred to the sign shop, but he didn't believe he could do that work due to his tremors.

The VE testified that Plaintiff's two former jobs were semi-skilled at the medium exertional level of work.  The VE testified that, due to the retail sales aspect of his job as a route sales driver, Plaintiff, as a 55-year old individual (Plaintiff's age when he filed for disability benefits), had transferable skills for semi-skilled jobs at the light exertional level, such as cashiering or sales clerk jobs.  The VE stated the customer service aspect of Plaintiff's former work would also transfer to work in retail stores.  However, as a 55 to 60-year old individual (Plaintiff's current age), Plaintiff did not have transferable skills to light exertional jobs that would entail no vocational adjustment; rather, any such jobs would require on-the-job vocational adjustment of 30 to 45 days.

8

**ALJ's Decision of May 29, 2009 (Tr. 56-66)**

The ALJ found that after April 2007, Plaintiff suffered from the severe impairments of degenerative disc disease, tremor, hypertension, obstructive sleep apnea and obesity. The ALJ found that Plaintiff's mental impairment was "by itself" not a severe impairment, as Plaintiff had no limitations in each of the four functional areas relevant in evaluating mental impairments: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

The ALJ determined that none of Plaintiff's impairments alone or in combination met the requirements for a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ then concluded that Plaintiff had the RFC to perform the full range of medium work. In reaching this conclusion, he first found that Plaintiff's non-severe mental impairment did not limit his ability to work. The ALJ stated that Dr. Ginther had not referred Plaintiff to a psychologist or psychiatrist for treatment, which suggested that Plaintiff's mental impairment was not that severe. The ALJ stated that Plaintiff's GAF scores showed "only mild to moderate symptoms."

The ALJ set forth the factors relevant to assessing a claimant's credibility, citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). The ALJ stated that asserting a disability onset date of October 15, 2005, for which there was no medical basis at all, undermined Plaintiff's credibility. The ALJ also noted that no treating physician "ever found or imposed any long term, significant and adverse mental or physical limitations on [Plaintiff's] functional capacity."

9

Noting the absence of evidence of severe persistent muscle spasms, loss of range of motion, or loss of strength, the ALJ believed that the reasonable inference was that Plaintiff's pain was not as intense, persistent, and limiting as he alleged. Plaintiff's non-compliance with regard to ceasing to smoke and drink was seen as inconsistent with being "truly desirous of work." The ALJ noted that Plaintiff left his job as a beer truck driver because the company replaced all workers with non-union workers. The ALJ recognized Plaintiff's good earnings history, but felt that the credibility this afforded Plaintiff was negated by the remainder of the record.

The ALJ concluded that Plaintiff could perform his past work as a beer route sales driver, which, according to the VE, was semi-skilled, medium work. The ALJ again pointed to the fact that Plaintiff had worked in 2006 and 2007 as a highway maintenance worker, showing that he had the ability to engage in medium work activity, as did the treadmill test in August 2008. The ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from October 15, 2005, through the date of the decision.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole." Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011). The court "'may not reverse . . . merely because substantial evidence

would support a contrary outcome. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." Id. (citations omitted); see also Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520(c)(3).

If the claimant does not have a severe impairment that meets the duration

requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix I. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If so, the claimant is not disabled. If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience. Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010). Here, the ALJ determined at step four that Plaintiff could perform past relevant work.

**ALJ's Assessment of Plaintiff's Physical RFC**

Plaintiff argues that there is no medical evidence to support the ALJ's finding that Plaintiff could perform medium work, and that ALJ failed in his duty to develop the record in this regard.

A disability claimant's RFC reflects what he can still do despite his limitations. 20 C.F.R. § 404.1545(a). The "'most important issue'" in a disability determination is whether the claimant has the RFC "to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (citation omitted). The ALJ's determination of an individual's RFC should be "based on all the evidence in the

12

record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citation omitted).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007) (citing Lauer v. Apfel, 2 45 F.3d 700, 704 (8th Cir. 2001)). The absence of an explicit reference to "work" in close proximity to the description of the claimant's medically evaluated limitations does not make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation; such explicit language is unnecessary where the medical evaluation describes the claimant's functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." Id. n.6.

Here, the Commissioner does not point to any direct evidence by a medical source that supports the ALJ's determination that Plaintiff had the physical RFC to perform the full range of medium work. Rather the Commissioner argues that the medical evidence reveals infrequent treatment, few objective signs of any physical limitations, and no indications from any of Plaintiff's physicians that he was unable to perform work activity. This, according to the Commissioner, in addition to the fact that Plaintiff applied for disability benefits when he was laid off from his job for reasons unrelated to his alleged impairments, provided sufficient evidence for the ALJ to determine that Plaintiff had the

13

physical RFC to perform his past work.

The Court believes that a close question is presented, but that in sum, the ALJ was entitled to determine at step four of the sequential evaluation process that Plaintiff could perform medium work and thus his past job as a route sales driver. Most notably, the August 2009 neurological exam and MRI provides medical support for the ALJ's findings in this regard. As noted above, the exam showed no pain in Plaintiff's joints or muscles, "5/5" upper and lower extremities motor testing, normal gait, and negative straight leg raise testing. The report also noted that Plaintiff was bicycling and walking. See Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (holding that records that demonstrated that the plaintiff was encouraged to exercise constituted medical evidence supporting the RFC, even though there were no specific discussions of work restrictions in the records); Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (finding that substantial evidence supported the ALJ's conclusion that the claimant had the RFC to perform light work, and thus her past work, where medical records indicated that she suffered mild degenerative changes in her back condition, even though the medical evidence was silent with regard to work-related restrictions such as the length of time she could sit, stand, and walk; as it was the claimant's burden to prove at step four that she could not perform her past relevant work); Bauer v. Soc. Sec. Admin., 734 F. Supp. 2d 773, 809-10 (D. Minn. 2010).

The ALJ's finding that Plaintiff could perform medium work is further supported by the fact that Plaintiff took almost no pain medication. See, e.g., Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (stating that a claimant's allegations of disabling pain

14

may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications). And the fact that Plaintiff filed for disability benefits after being laid off from his job for reasons unrelated to his mental or physical condition is a significant consideration. See Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009); Deposer v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). The ALJ also properly considered Plaintiff's largely normal activities of daily living. See, e.g., Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009).

While the absence of physician-ordered functional restrictions, where a doctor was not asked to comment on the claimant's work ability, does not necessarily constitute "substantial evidence" of the absence of disability, the fact that no examining or treating physician ever placed any functional limitations on Plaintiff is certainly a factor that is inconsistent with Plaintiff's allegations of disability. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993).

The Court also rejects Plaintiff's argument that the ALJ failed in his duty to develop the record. It is true that an ALJ has a duty to develop the record fully, but a plaintiff "bears a heavy burden in showing the record has been inadequately developed. He must show both a failure to develop necessary evidence and unfairness or prejudice from that failure." Combs v. Astrue, 243 F. App'x 200, 204-05 (8th Cir. 2007) (citing Haley v. Massanari, 258 F.3d 742, 749-750 (8th Cir. 2001). An ALJ may issue a decision without obtaining additional evidence if existing evidence provides a sufficient basis for his decision. Id.

Here, the extensive medical record includes reports from numerous treating physicians. Furthermore, Plaintiff presents no evidence that further inquiry by the ALJ into Plaintiff's physical RFC would have yielded favorable evidence. Thus Plaintiff has failed to establish the prejudice necessary for a reversal due to the ALJ's failure to develop the record. See Lacroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006) (citing Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993); Boyd v. Barnhart, 258 F. Supp.2d 1013, 1019 (E.D. Mo. 2003) (holding that the ALJ was not required to order a consultative examination, where there were medical records that discussed the impairment, which allowed the ALJ to make an informed decision.).

**ALJ's Assessment of Plaintiff's Mental RFC**

Plaintiff argues that the ALJ failed to properly consider Plaintiff's GAF scores in finding that Plaintiff's mental impairments were not severe. As noted above, Plaintiff's GAF scores were generally 60, indicating moderate mental limitations. This score is one point below the "mild" limitation range, and in fact on one occasion, Plaintiff's GAF was assessed as 61. It is true that on one occasion, Plaintiff's GAF score was 55, but in light of his general scores in the moderate range of limitation, together with multiple mental status exams revealing no real abnormalities, the Court concludes that the ALJ did not err in concluding that Plaintiff's ability to perform his past work was not limited by mental impairments. See Halverson, 600 F.3d at 931 (holding that the ALJ was entitled to rely on the claimant's history of GAF scores between 52 and 60, in finding that the plaintiff was not disabled, despite one GAF of 40 and a treating psychiatrist's assessment of more

severe limitations, where mental status examinations were largely unremarkable).

**Analysis of Plaintiff's Past Work**

It is true, as Plaintiff argues, that in determining whether a claimant can perform his past relevant work, an ALJ must compare the limiting effects of the claimant's impairments with the demands of such work.  See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004).  Here the ALJ relied upon the testimony of the VE in determining the demands of Plaintiff's job as a route sales driver, which was entirely proper.  See 20 C.F.R. § 404.1560(b)(2) (VE may offer evidence concerning demands of claimant's past relevant work, either as claimant actually performed it or as generally performed in the national economy); Yates v. Astrue, 347 F. App'x 269, 271 (8th Cir. 2009); Wagner v. Astrue, 499 F.3d 842, 853-54 (8th Cir. 2007).

## CONCLUSION

In sum, the Court does not suggest that the record is devoid of evidence which supports some of Plaintiff's subjective complaints, but the Court will not disturb the decision of an ALJ who considers, but for good cause discredits, a claimant's complaints of disabling symptoms, simply because, in the first instance, the Court might have reached a different assessment.  See, e.g., Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 28th day of March, 2011.